UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA,

                              Plaintiff,

                -v.-

JARRETT ADAIR,

                              Defendant.

21 Civ. 10883 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Teachers Insurance and Annuity Association of America ("Plaintiff" or "TIAA") is a New York life insurance company. Jarrett Adair ("Defendant") was employed as a Wealth Management Advisor in Plaintiff's Lewisville, Texas, office from 2013 until 2020. In this suit, Plaintiff alleges that Defendant breached the terms of their separation agreement by soliciting business from TIAA customers while at his new position at the Edward Jones financial services firm.

Defendant now moves to compel arbitration, citing two agreements — one executed during his onboarding at TIAA and one executed during his separation from the company — that ostensibly mandate arbitration of the instant claims. Defendant also argues that Plaintiff is subject to the arbitration obligations of one of its subsidiaries. Plaintiff opposes the motion, arguing that neither agreement contains an arbitration provision and that there is no factual basis to bind it to its subsidiary's obligations. For the reasons set forth

below, the Court finds that this suit is properly before it and denies

Defendant's motion to compel arbitration.

BACKGROUND[1]

**A.      Factual Background**

**1.      Defendant's Employment with TIAA**

"TIAA is a non-profit, legal reserve life insurance company which was

organized in 1918 by the Carnegie Foundation for the Advancement of

Teaching." *Spirt* v. *Tchrs. Ins. & Annuity Ass'n*, 691 F.2d 1054, 1057 (2d Cir.

1982), *cert. granted, judgment vacated on other grounds*, 463 U.S. 1223 (1983).

"In 1952, TIAA's companion organization, [College Retirement Equities Fund (or

'CREF')], was created in order to allow the investment of pension funds in

financial instruments other than those traditionally permissible for annuity

funds like TIAA." *Id.*; *see generally Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.*,

— F. Supp. 3d —, No. 21 Civ. 8384 (KPF), 2022 WL 4538213, at *2 (S.D.N.Y.

Sept. 27, 2022); *Wilcox* v. *Georgetown Univ.*, No. 18 Civ. 422 (RMC), 2019 WL

132281, at *2 (D.D.C. Jan. 8, 2019); *Sacerdote* v. *N.Y. Univ.*, 328 F. Supp. 3d

---

[1]      The facts contained in this Opinion are drawn primarily from the Complaint ("Compl."
(Dkt. #1)); the Declaration of Joseph Bonjorino in Support of Plaintiff's Motion for a
Preliminary Injunction ("Bonjorino Decl." (Dkt. #7)), and the exhibits thereto; the
Declaration of Angela A. Turiano in Support of Defendant's Motion to Compel
Arbitration ("Turiano Decl." (Dkt. #28)), and the exhibits thereto; the Supplemental
Declaration of Alex T. Paradiso in Opposition to Defendant's Motion to Compel
Arbitration ("Paradiso Decl." (Dkt. #34)), and the exhibits thereto; and the Declaration of
Jarrett Adair in Support of Defendant's Motion to Compel Arbitration ("Adair Decl."
(Dkt. #35)), and the exhibits thereto.

For ease of reference, the Court refers to Defendant's Memorandum of Law in Support
of his Motion to Compel Arbitration as "Def. Br." (Dkt. #29); to Plaintiff's Memorandum
of Law in Opposition to Defendant's Motion to Compel Arbitration as "Pl. Opp." (Dkt.
#31); and to Defendant's Reply Memorandum in Further Support of his Motion to
Compel Arbitration as "Def. Reply" (Dkt. #36).

273, 313 (S.D.N.Y. 2018), *aff'd*, 9 F.4th 95 (2d Cir. 2021).  After operating for

decades along with numerous affiliates under the TIAA-CREF umbrella, in

2016, the company changed its name to TIAA.  Press Release, "TIAA-CREF

Begins New Chapter as TIAA" (Feb. 22, 2016), https://tiaa.new-media-

release.com/branding/pages/fullrelease.html#more.

        In September 2013, Defendant received an offer to "join Teachers

Insurance and Annuity Association of America ('TIAA') … [as a] Wealth

Management Advisor — Lewisville, TX[.]"  ("Offer Letter" (Adair Decl., Ex. C);

*see also* Adair Decl. ¶ 3).  In the course of accepting the offer, Defendant signed

a Confidentiality and Non-Solicitation Agreement dated September 4, 2013 (the

"CNA" (Bonjorino Decl., Ex. C)).  The CNA displays the "TIAA CREF" logo and

identifies as Defendant's employer "the entity within the [TIAA] family of

companies that employs Employee on the Effective Date."  (CNA 22).  The CNA

further states that Defendant's obligations under the agreement extend to

"TIAA and any companion entity or subsidiary of TIAA, now existing or formed

in the future (collectively, the 'Company')[.]"  (*Id.*).

        The CNA contains a non-compete provision.  Under the heading

"UNAUTHORIZED DISCLOSURE OR USE OF THE COMPANY'S CONFIDENTIAL

INFORMATION IS PROHIBITED," the CNA forbids Defendant from disclosing

information pertaining to, among other things, the company's actual or

prospective clients, accounts, and agreements "with any participant, client,

investor, vendor, supplier, licensor, licensee, employee, supplier or contractor

with whom [TIAA] may be associated[.]"  (CNA §§ 1(a)(i), (iv), (v)).  A different

subsection states that during a "Restricted Period" encompassing the term of Defendant's employment and the twelve months immediately following the end of such employment (*id.* § 2(b)), Defendant "shall not … solicit, divert, take away, or attempt to solicit, divert, or take away … any Client, with whom or which [he] had Material Contact, for the purpose of having such Client terminate, cancel, withdraw, reduce, diminish or limit, in any manner, the Client's relationship with the Company." (*Id.* § 2(c)). The CNA also contemplates, and makes provision for, disputes arising under its provisions. (*Id.* § 7 (stating that "[n]othing … shall be construed to prohibit the Company from seeking any other equitable or legal remedies for such breach or threatened breach, including the recovery of money damages from [Defendant]")).

### 2.    Defendant's Separation from TIAA

In November 2020, Defendant signed a Voluntary Separation Agreement (the "VSP" (Bonjorino Decl., Ex. C)) in furtherance of his resignation from TIAA. (VSP ¶ 24). The VSP explicitly identifies Plaintiff as Defendant's employer, stating, "Your employer ('Employer') is Teachers Insurance and Annuity Association of America." (*Id.* ¶ 1(b)(i)). The VSP also specifies that in consideration for his agreement to separate from the company, Defendant will receive a "separation payment" derived from his gross base salary, less (among other things) any monthly or quarterly incentive compensation payments related to his performance in 2020. (*Id.* ¶ 2(a)).

Like the CNA, the VSP addresses Defendant's non-interference and non-solicitation obligations regarding his former clients.  (VSP ¶ 8(b)(ii)(C)).  It specifies that in signing the VSP, Defendant agrees that for a period of twenty-four months after his resignation date, he would not "solicit, divert, take away, or attempt to solicit, divert, or take away … any Client with whom or which [Defendant] had Material Contact, for the purpose of having such Client terminate, cancel, withdraw, reduce, diminish or limit, in any manner, the Client's relationship with TIAA."  (*Id.*).

The VSP also contains a merger clause.  Paragraph 16 provides that the VSP "constitutes the complete understanding between [Defendant] and TIAA as to the subject matter of this Agreement and supersedes any and all prior agreements, whether written or oral, on said matters … except as provided in Paragraph 8(e) of this Agreement."  (VSP ¶ 16).  Paragraph 8(e), in turn, provides that the VSP's non-compete obligations are "in addition to and are enforceable in connection with any similar terms in any plan or other agreement with TIAA to which [Defendant is] subject and do not supersede such terms, which [Defendant] hereby confirm[s] and agree[s] to honor fully." (*Id.* ¶ 8(e)).  It goes on to say that "[i]f any written agreement between [Defendant] and TIAA imposes restrictions and/or obligations on [Defendant] that conflict with terms in this Agreement (for instance a longer non-solicitation of Clients or employees), those restrictions and/or obligations that TIAA deems more protective of its interests shall govern."  (*Id.*).

The VSP specifies its own mode of enforcement.  Paragraph 11 provides that Defendant's "actual or threatened breach of any provision of Paragraph 6, 7, 8, 9, or 10 of this Agreement shall entitle TIAA to all forms of injunctive relief to compel [Defendant's] specific performance of [his] obligations under those Paragraphs[.]" (VSP ¶ 11).  It goes on to emphasize that "[n]othing in this paragraph shall be construed to prohibit TIAA from seeking any other equitable or legal remedies for such breach or threatened breach, including the recovery of money damages[.]" (*Id.*).  The VSP specifically acknowledges the potential for actions enforcing the agreement, stating "[i]f TIAA prevails in any action to enforce any provision of Paragraph 6, 7, 8, 9, 10 of this Agreement, TIAA shall be entitled to reasonable attorney's fees, expenses, and costs incurred with respect to such action." (*Id.*).  Finally, in Paragraph 19, Defendant "agree[s] to submit to the jurisdiction of the courts of the State of New York or the federal court located in the Southern District of New York in connection with any action related to this Agreement[.]" (*Id.* ¶ 19).

## B.    Procedural Background

Plaintiff filed the Complaint in this action on December 20, 2021, alleging that Defendant had breached his obligations under the non-solicitation and confidentiality provisions of the VSP.  (Dkt. #1).  That same day, Plaintiff filed a proposed Order to Show Cause for a Preliminary Injunction with Expedited Discovery and supporting papers.  (Dkt. # 4-9).  Several months passed, during which the parties attempted to resolve the dispute without further litigation.  On April 26, 2022, Plaintiff filed a letter reporting that the

parties' settlement efforts had been unsuccessful and requesting an extension of time to effectuate service on Defendant. (Dkt. #10). The Court ordered Plaintiff to serve Defendant on or before May 11, 2022. (Dkt. #11).

On June 27, 2022, Defendant filed an Answer to the Complaint. (Dkt. #22). That same day, Defendant filed a motion to compel arbitration and to stay the action pending such arbitration (Dkt. #23-26), which motion the Clerk of Court denied as improperly filed. Defendant filed a renewed motion to compel arbitration and accompanying papers on July 1, 2022. (Dkt. #27-29). Plaintiff filed a brief in opposition to the motion on July 11, 2022 (Dkt. #31), and a supporting declaration on July 14, 2022 (Dkt. #34). Defendant filed a reply memorandum and supporting papers on July 22, 2022. (Dkt. #35-36).

## DISCUSSION

### A.   Applicable Law

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted). Section 2 of the FAA provides, "[a] written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a

7

counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement. *Id.* § 4.

A court ruling on a petition to compel arbitration must decide: (i) whether the parties agreed to arbitrate, and, if so, (ii) whether the scope of that agreement encompasses the claims at issue. *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (internal quotation marks and citations omitted). In resolving a motion to compel arbitration, the court applies a "standard similar to that applicable for a motion for summary judgment." *Meyer*, 868 F.3d at 74 (internal quotations omitted). "[T]he court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks, alterations, and citations omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). However, a party may not defeat a motion to compel arbitration through "general denials of the facts on which the right to arbitration depends." *Oppenheimer & Co., Inc.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). In other words, "[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.*

In accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," a court must resolve any doubts concerning the scope of arbitrable issues "in favor of arbitrability." *Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *State of N.Y.* v. *Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)), *cert. denied*, 140 S. Ct. 1117 (2020). In so doing, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks and citation omitted).

The antecedent issue of whether parties have agreed to arbitrate is determined under state law. *See Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract ... the ultimate question of whether the parties agreed to arbitrate is determined by state law."). Under New York law, the party seeking arbitration must prove by a preponderance of the evidence that a valid arbitration agreement exists. *Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993). A valid arbitration agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement[.]" *In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). By signing a written instrument, a party creates presumptive evidence of its assent to enter into a binding agreement. *See, e.g.*, *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *Gillman* v. *Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988)

9

(holding that a party's signature generally creates a presumption that the party assented to the terms of the agreement).

Courts do not apply the presumption of arbitrability to "disputes concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co.* v. *Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (quoting *Applied Energetics, Inc.* v. *NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)).  That is because "[i]t is the court's duty to interpret and construe an arbitration provision, but only where a contract is 'validly formed' and 'legally enforceable.'" *Kulig* v. *Midland Funding, LLC*, No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013) (internal citations omitted); *see also Application of Whitehaven S.F., LLC* v. *Spangler*, 45 F. Supp. 3d 333, 343 (S.D.N.Y. 2014).

## B.   The Court Denies Defendant's Motion to Compel Arbitration

### 1.   The Relevant Parties to the Dispute Are Plaintiff and Defendant Only

As an initial matter, the parties dispute which TIAA entity is Defendant's employer.  Defendant asserts that he was employed concurrently by both Plaintiff and TIAA-CREF Individual & Institutional Services, LLC ("TC Services"), the latter a wholly-owned subsidiary of Plaintiff.  (Def. Br. 1-3).[2]  He

---

[2]     TC Services, a non-party in this action, is "dually-registered as a FINRA-regulated broker-dealer" and a registered investment advisor with the Securities and Exchange Commission (the "SEC").  (Adair Decl. ¶ 5; *see also* Pl. Opp. 2, 5 (describing TC Services alternately as "TIAA's broker-dealer affiliate" and its "FINRA broker-dealer subsidiary")). FINRA is the Financial Industry Regulatory Authority, Inc., "a self-regulatory organization that regulates broker-dealers and their affiliated employees in the United States."  (Def. Br. 5).  According to Defendant, FINRA membership "constitutes an agreement to adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein."  (*Id.* (citing *In re Am. Exp. Fin. Advisors Sec.*

states that during his employment, "more than 50% of [his] compensation was derived from his activity as a FINRA-registered representative for TC Services, with the balance … derived from insurance sales with TIAA and institutional sales through other subsidiaries of TIAA." (Adair Decl. ¶ 7).  What is more, Defendant asserts that "both TIAA and TC Services offered [him] the 'opportunity to elect … to voluntarily resign from [his] employment.'" (*Id.* ¶ 8). Defendant further asserts that while he denies "any improper solicitation in violation of the VSP," he believes that the clients referenced by TIAA in the Complaint are actually clients of TC Services.  (*Id.* ¶ 10).  Plaintiff counters that it was Defendant's employer at the time of his separation from his wealth management advisor role.  (Pl. Opp. 2).

The Court acknowledges that the documents before it are not perfectly clear about the identity of Defendant's employer(s).  Favoring Plaintiff's argument, both the Offer Letter and the VSP identify Plaintiff as Defendant's employer.  (Offer Letter 2 (inviting Defendant to "join Teachers Insurance and Annuity Association of America ('TIAA')"); VSP ¶ 1(b)(i) ("Your employer ('Employer') is Teachers Insurance and Annuity Association of America.").  The CNA offers no additional clarity; it defines Defendant's employer somewhat circularly as "the entity within the Teachers Insurance and Annuity Association of America ('TIAA') family of companies that employs [Defendant] on the Effective Date[.]"  (CNA 22).  Conversely, Defendants' allegation of concurrent

---

*Litig.* 672 F.3d 113, 128 (2d Cir. 2011) (internal quotation marks and citations omitted))).  FINRA's arbitration provisions, and their applicability *vel non* to the instant dispute, are discussed *infra*.

employment at TC Services finds some support in the historical portion of his Form U-4, in which Defendant lists TC Services in his Employment History (Adair Decl., Ex. E; *see also id.* ¶¶ 4-6 (recounting Defendant's registration with FINRA in the course of employment at TC Services)), suggesting that, at a minimum, Defendant believed himself to be employed by both entities.

The Court need not definitively resolve the issue of which TIAA entity or entities employed Defendant at which time periods, because it is clear that the instant action arises from Defendant's obligations to Plaintiff.  The Complaint makes clear that Plaintiff's non-compete claim is being pursued *only* as a violation of the VSP, a contract between Plaintiff and Defendant.  (Compl. ¶¶ 22-25).  That claim, Plaintiff asserts, arises from damages to Plaintiff, and not TC Services; in this regard, Plaintiff emphasizes that "numerous *TIAA* clients had transferred millions of dollars in assets to Defendant and Edward Jones" (Bonjorino Decl. ¶ 16 (emphasis added)), and that "TC Services is not seeking any damages" (Pl. Opp. 5).  Because the VSP specifies Plaintiff alone as Defendant's employer and because this suit pertains only to Defendant's alleged breach of his obligations to Plaintiff under the VSP, the relevant parties to this dispute are Plaintiff and Defendant, and not TC Services.

### 2.    Plaintiff Is Not Subject to FINRA's Arbitration Requirement

Bound up in Defendant's arguments about TC Services being his employer is his argument that Plaintiff's claims must be submitted to arbitration in light of "FINRA's mandatory dispute resolution program applicable to FINRA members and associated persons."  (Def. Br. 10).  Plaintiff

counters that it is not a FINRA member, and that it is not otherwise subject to FINRA rules. (Pl. Opp. 3-5). Because of its criticality to Defendant's arguments under the CNA and VSP, the Court considers whether Plaintiff is subject to FINRA arbitration — either in its own right or as a consequence of its relationship with TC Services — and concludes that, at least as to the claims in this suit, it is not.

### a.   Plaintiff Is Not Subject to FINRA's Arbitration Requirement in Its Own Right

FINRA Rule 13200 requires that "a dispute must be arbitrated under the [FINRA] Code if the dispute arises out of the business activities of a member or an associated person and is between or among: 'Members; Members and Associated Persons; or Associated Persons.'" FINRA Code, Rule 13200(a) (all FINRA Rules available at https://www.finra.org/rules-guidance/rulebooks /finra-rules) (last visited Mar. 16, 2023). The term "Member" includes "any individual, partnership, corporation or other legal entity admitted to membership in FINRA under the provisions of Articles III and IV of the FINRA By-Laws." FINRA Code, Rule 0160(b)(10). An "Associated Person" is:

> (1) a natural person registered under FINRA rules; or (2) a sole proprietor, or any partner, officer, director, branch manager of the Applicant, or any person occupying a similar status or performing similar functions; (3) any company, government or political subdivision or agency or instrumentality of a government controlled by or controlling the Applicant; (4) any employee of the Applicant, except any person whose functions are solely clerical or ministerial; (5) any person directly or indirectly controlling the Applicant whether or not such person is registered or exempt from registration under the FINRA By-Laws or FINRA rules; (6) any person engaged in investment banking or

> securities business controlled directly or indirectly by
> the Applicant whether such person is registered or
> exempt from registration under the FINRA By-Laws or
> FINRA rules; or (7) any person who will be or is
> anticipated to be a person described in (1) through (6)
> above.

FINRA Code, Rule 1011(b).  Therefore, in order for FINRA Rule 13200 to cover

this dispute, Plaintiff and Defendant each have to qualify as a FINRA member

or associated person.

The parties do not dispute that Defendant is a FINRA member.  (Adair

Decl. ¶ 2).  But Defendant cannot credibly claim that Plaintiff is a FINRA

member or an associated person.  This Court has previously held on a similar

record that a parent company of a wholly-owned FINRA-member subsidiary is

not subject to FINRA's arbitration requirement, and sees no reason to conclude

differently here.  *See W.P. Carey Inc.* v. *Bigler*, No. 18 Civ. 585 (KPF), 2019 WL

1382898, at *10 (S.D.N.Y. Mar. 27, 2019).[3]  Other courts in this Circuit have

held the same.  In *Oppenheimer & Co., Inc.* v. *Deutsche Bank AG,* petitioner

Oppenheimer & Co. Inc. ("Oppenheimer") sought to arbitrate before FINRA with

Deutsche Bank AG ("DBAG") and its subsidiary, Deutsche Bank Securities, Inc.

("DBSI").  No. 09 Civ. 8154 (LAP), 2010 WL 743915, at *1 (S.D.N.Y. Mar. 2,

2010).  DBSI was a FINRA member and was, as a result, obligated to arbitrate

---

[3]     While the Court does not rely on this fact in the instant Opinion, FINRA's Office of
Dispute Resolution advised defense counsel in *W.P. Carey* that the plaintiff parent
company was "not compelled by the Code of Arbitration Procedure to arbitrate
disputes[] in [the FINRA] forum" and, further, that because the parent company did not
voluntarily submit to FINRA's jurisdiction, the FINRA arbitration panel had no power to
render an enforceable award against it.  *See W.P. Carey Inc.* v. *Bigler*, No. 18 Civ. 585
(KPF), 2019 WL 1382898, at *3 (S.D.N.Y. Mar. 27, 2019)).

Oppenheimer's claims.  *Id.*  However, parent company DBAG was not a FINRA member, so the district court denied Oppenheimer's effort to compel DBAG to arbitration.  *Id.*;[4] *see also Ayco Co., L.P.* v. *Frisch*, No. 11 Civ. 580 (LEK) (DRH), 2012 WL 42134, at *6 (N.D.N.Y. Jan. 9, 2012) (denying a motion to compel arbitration under FINRA Rule 13200(a) because "[the plaintiff] is not a FINRA member" (quoting *Oppenheimer*, 2010 WL 743915, at *2)).  Accordingly, Defendant's assertion that Plaintiff is subject to FINRA-mandated arbitration as a member or associated person cannot be sustained on this record.

### b.   Plaintiff's Relationship with TC Services Does Not Subject It to FINRA Arbitration Obligations

As a fallback position, Defendant argues that Plaintiff's relationship with TC Services subjects Plaintiff to the latter's FINRA arbitration obligations.  (Def. Br. 6).  In particular, Defendant argues that Plaintiff "should not be permitted to intentionally structure its agreement to escape its subsidiary's obligation to litigate disputes with its associated persons (here, [Defendant]) before FINRA."  (*Id.* at 7).  The Court is appropriately vigilant of the possibility that a parent company could be intentionally vague about the identity of an individual's employer in order to evade the arbitration obligations of members of its corporate family.[5]  It thus considers whether Defendant has shown such circumvention here.

---

[4]     As discussed *infra*, the *Oppenheimer* court also declined to compel DBAG, a non-signatory to the contract at issue, to submit to arbitration under estoppel or veil-piercing/alter ego theories.

[5]     FINRA apparently shares the Court's concern:  In 2012, it fined FINRA member Merrill Lynch $1 million for structuring a bonus program to appear to be funded by a non-

The common law offers several doctrines to prevent this type of manipulation of the corporate form.  Defendant cites a small selection of cases where courts have seemingly been motivated by concerns about a company evading an arbitration requirement by dint of its relationship with other corporate entities.  (*See* Def. Br. 6 (citing *Gilman Ciocia, Inc* v. *Bryan Byrne,* No. 2016-50580, 2017 WL 11530334 (N.Y. Sup. Ct. Oct. 16, 2017), and *BGC Notes, LLC* v. *Gordon*, 36 N.Y.S.3d 130, 133 (1st Dep't 2016))).  Because New York law offers no freestanding "unfairness" exception to the rule that non-signatories are generally not bound to the arbitration agreements of others, the Court construes Defendant's reliance on these cases as an invocation of the common law doctrines.  In brief, these doctrines ask whether two entities are so intertwined that it would be inequitable to strictly observe corporate formalities at the expense of equity.  Because the relevant employer for purposes of this suit is Plaintiff, this action is subject to FINRA's arbitration rule only if TC Services' obligations can be attributed to Plaintiff.

### i.    Applicable Law

New York law recognizes five theories under which non-signatories may be bound to the arbitration agreements of others: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel.  *See Thomson-CSF, S.A.* v. *Am. Arb. Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995); *see also Kwatinetz* v. *Mason*, 356 F. Supp. 3d 343, 348 (S.D.N.Y. 2018).  "These

---

FINRA affiliate in order to circumvent Merrill Lynch's obligations to arbitrate disagreements relating to the program.  (Def. Br., Ex. D).

limited exceptions follow 'ordinary principles of contract and agency' and serve to 'protect parent companies' when subsidiaries enter into arbitration agreements; for this reason, 'anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations.'" *Oppenheimer*, 2010 WL 743915, at *2 (quoting *Merrill Lynch Inv. Managers* v. *Optibase, Ltd.,* 337 F.3d 125, 130 (2d Cir. 2003)) (emphasis in original and alteration adopted).  The party seeking to arbitrate with a non-signatory bears the burden of proving the applicability of one or more of the five listed theories.  *Sheet Metal Workers' Int'l Ass'n Local Union No. 38* v. *Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004).

### ii. The VSP Does Not Incorporate the FINRA Arbitration Requirement by Reference

To begin, Defendant argues that "the lack of arbitration agreement in the subsequently signed VSP" should not "invalidate" what he sees as Plaintiff's "previous acknowledgement" of an obligation to arbitrate.  (Def. Br. 8).  Instead — and somewhat brazenly — Defendant claims that the VSP's non-solicitation provision "specifically incorporates his agreement with TC Services (and the accompanying obligation to arbitrate those disputes)."  (*Id.* at 10).

"A non[-]signatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the non[-]signatory which incorporates the existing arbitration clause."  *Thomson-CSF*, 64 F.3d at 777; *see also Imp. Exp. Steel Corp.* v. *Miss. Valley Barge Line Co.,* 351 F.2d 503, 505-06 (2d Cir. 1965)

17

(determining that separate agreement with non-signatory expressly "assum[ing] all the obligations and privileges of [signatory party] under the ... subcharter" constitutes grounds for enforcement of arbitration clause by non-signatory). The Court understands Defendant to be arguing that the CNA includes both a non-solicitation provision and a mandatory arbitration clause by dint of TC Services' FINRA obligations; because there is also a non-solicitation provision in Paragraph 8 of the VSP, Defendant reasons, the VSP must specifically preclude arbitration for its forum selection provision to supersede what he sees as the CNA's mandate to arbitrate non-solicitation breaches in a FINRA forum. (Def. Br. 8).

Unfortunately for Defendant, mere conclusory assertions that the VSP incorporates Defendant's prior agreement with TC Services fall far short of what must be shown for incorporation by reference.  Moreover, as addressed *infra*, neither the CNA nor the VSP obligates arbitration by its own terms. Thus, even if the VSP could be read to incorporate the CNA, it does not follow that it further incorporates TC Services' agreement to arbitrate as a FINRA member, and it would not mandate arbitration of the present dispute.

### iii.    Plaintiff Is Not Subject to TC Services' Arbitration Obligations as Its Agent

Defendant next seems to suggest that Plaintiff is subject to TC Services' arbitration obligations as its agent.  On this point, Defendant emphasizes that TC Services is "solely owned" by Plaintiff (Def. Br. 1-2); that the Offer Letter and CNA reference TC Services (Adair Decl. ¶ 3; Def. Br. 2); that "more than 50% of [his] compensation was derived from [his] activity as a FINRA-registered

18

representative for TC Services" (Adair Decl. ¶ 7); and that he was terminated by both TIAA and TC Services under a voluntary separation agreement (*id.* ¶ 8).

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Optibase*, 337 F.3d at 130 (quoting RESTATEMENT (SECOND) OF AGENCY § 1 (1958)). "Traditional principles of agency law may bind a non[-]signatory to an arbitration agreement." *Thomson-CSF*, 64 F.3d at 777. "An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) (citing *Comm. Union Ins. Co.* v. *Alitalia Airlines*, 347 F.3d 448, 462 (2d Cir. 2003)). "An agent's authority to act on the principal's behalf 'may be express, implied or apparent.'" *Ayco*, 2012 WL 42134, at *7 (citing *Flame Cut Steel Prod., Inc.* v. *Performance Foams & Coatings, Inc.*, 46 F. Supp. 2d 222, 228 (E.D.N.Y. 1999)). However, "conclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel … unwilling non-signatories to arbitrate under that theory." *AICO Int'l* v. *Merrill Lynch & Co.*, 98 F. App'x 44, 46-47 (2d Cir. 2004) (summary order) (citing *Optibase*, 337 F.3d at 130-31).

The facts before the Court do not establish an agency relationship between Plaintiff and TC Services. It is simply not enough to assert that Plaintiff wholly owns and is the corporate parent of TC Services, and the mere

inclusion of TIAA-CREF insignia on certain of Plaintiff's documents does not alter the analysis. The Second Circuit has held that similar factors alone are insufficient to bind a non-signatory to an arbitration agreement signed by an affiliate. *Thomson-CSF*, 64 F.3d at 780. The district court in that case compelled a parent corporation to arbitrate with a third party based on an arbitration agreement between the third party and one of the company's subsidiaries. In so doing, the district court looked to: (i) the parent's common ownership of the subsidiary; (ii) the parent's actual control of the subsidiary; (iii) the parent's notice of the agreement to arbitrate prior to purchasing the subsidiary; (iv) the third party's express intention to bind the parent to the agreement to arbitrate; (v) the parent's incorporation of the subsidiary into its own organizational and decision-making structure; and (vi) the parent's benefit from that incorporation. *Id.* The Second Circuit soundly rejected this approach:

> The district court's [] approach dilutes the safeguards afforded to a non[-]signatory by the "ordinary principles of contract and agency" and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements. Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations.

*Id.* Thus, an agency theory premised solely on affiliation between parent and subsidiary — which is the core of Defendant's argument here — is insufficient to bind a non-signatory parent under Second Circuit law. *See also Optibase*, 337 F.3d at 130-31 (reiterating *Thomson-CSF*'s holding that "[a]nything short of

requiring a *full* showing of some accepted theory under agency ... imperils a vast number of parent corporations," and finding that absent such a showing it is "decisive" that the party resisting arbitration is a not a signatory).  Defendant offers no facts to support the assertion that TC Services consented to control by Plaintiff, or that any signatory to any arbitration agreement, with FINRA or otherwise, intended for both TC Services and Plaintiff to be bound.  *Cf. In re HBLS, L.P.*, No. 01 Civ. 2025 (JGK), 2001 WL 1490696, at *8 (S.D.N.Y. Nov. 21, 2001) (determining that an individual who signed an agreement containing an arbitration clause *both* on behalf of certain companies *and* as a shareholder with an interest in those companies was bound by the arbitration clause, as he had signed the agreement "as a private person").  Accordingly, Defendant's agency argument fails.

### iv.    Plaintiff Is Not Subject to TC Services' Arbitration Obligations as Its Alter Ego

Defendant's argument also fails when recast as an alter ego theory.  As factual support for an alter ego or veil-piercing theory, Defendant emphasizes that TC Services is a solely owned affiliate of Plaintiff, and that the CNA references TC Services.  (Def. Br. 1).  Defendant further alleges that both the CNA and VSP define "TIAA" to include its subsidiaries.  (*Id.* at 2-3).  Moreover, Defendant points out that the VSP provided for a payout that considered both his salary and incentive compensation payments he received while ostensibly employed by TC Services.  (*Id.* at 3).  And for legal support, Defendant cites *Gilman Ciocia*, in which an employee's motion to compel arbitration with the

21

FINRA-member parent company of his non-FINRA member former employer
was made on an alter ego theory.  *See* 2017 WL 11530334, at *2.

"[A] parent corporation and its subsidiary lose their distinct corporate
identities when their conduct demonstrates a virtual abandonment of
separateness."  *Thomson-CSF*, 64 F.3d at 778.  Under New York law, this
occurs when "[i] the owners exercised complete domination of the corporation
in respect to the transaction attacked; and [ii] that such domination was used
to commit a fraud or wrong against the plaintiff which resulted in plaintiff's
injury."  *Oppenheimer*, 2010 WL 743915, at *4 (citing *Morris* v. *N.Y. State Dep't
of Tax'n & Fin.,* 82 N.Y.2d 135, 141 (1993)).  In determining whether an owner
has completely dominated a corporation, courts consider:

> [i] Disregard of corporate formalities; [ii] inadequate
> capitalization; [iii] intermingling of funds; [iv] overlap in
> ownership, officers, directors, and personnel;
> [v] common office space, address and telephone
> numbers of corporate entities; [vi] the degree of
> discretion shown by the allegedly dominated
> corporation; [vii] whether the dealings between the
> entities are at arms length; [viii] whether the
> corporations are treated as independent profit centers;
> [ix] payment or guarantee of the corporation's debts by
> the dominating entity, and [x] intermingling of property
> between the entities.

*MAG Portfolio Consult, GMBH* v. *Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d
Cir. 2001).  Even where several of these factors cut in favor of piercing the
corporate veil, courts are reluctant to do so where evidence of domination is
incomplete.  *See Lakah* v. *UBS AG*, 996 F. Supp. 2d 250, 267 (S.D.N.Y. 2014)
("It is a remedy undertaken with extreme reluctance ... even where multiple

*Portfolio Consult* factors cut in favor of piercing the corporate veil[.]"); *see also Am. Fuel Corp.* v. *Utah Energy Dev't Co.*, 122 F.3d 130, 134-35 (2d Cir. 1997) (declining to pierce even where the corporation was a shell with no contracts, employees, independent office space, independent bank account, capital, or assets, and where the business expenses were paid out of pocket by the owner).  Of note, it is insufficient, in and of itself, that a parent company has complete ownership of a subsidiary's stock.  *De Jesus* v. *Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir. 1996).  Even consolidated financial reports and overlapping personnel are "commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness."  *McAnaney* v. *Astoria Fin. Corp.,* 665 F. Supp. 2d 132, 145 (E.D.N.Y. 2009).

On this point as well, *Oppenheimer & Co. Inc.* v. *Deutsche Bank AG* is instructive.  To review, Oppenheimer sought to compel DBAG, the subsidiary of a FINRA member, to arbitrate before FINRA.  2010 WL 743915, at *1. Oppenheimer argued that DBAG and DBSI were alter egos, and as such the court should compel DBAG to arbitrate pursuant to DBSI's FINRA affiliation. *Id.* at *4.  Indeed, Oppenheimer alleged that DBAG exercised complete ownership and control over DBSI and "directed its finances, polices, and management;" that there was "an overlap in personnel between DBAG and DBSI;" and that both had "the same address and telephone number."  *Id.*  The district court found these allegations insufficient because they did not establish the type of "day-to-day" control needed to pierce the corporate veil.  *Id.*

23

Moreover, the court found it significant that Oppenheimer failed to allege or provide evidence that DBSI was undercapitalized or failed to observe corporate familiarities. *Id.* at 5.

The present situation is analogous to *Oppenheimer*. Defendant did not — and indeed, could not — allege that TC Services is under-capitalized; as a broker-dealer registered with the SEC and FINRA, it is required to maintain certain minimum net capital levels on its own. *See Oppenheimer*, 2010 WL 743915, at *2 (noting that the subsidiary registered as a broker-dealer was "required to maintain minimum regulatory capital levels"). And, as in *Oppenheimer*, Defendant has failed to present evidence that TIAA and TC Services failed to observe corporate familiarities. Defendant has emphasized that TC Services is a "wholly-owned" subsidiary of TIAA, and noted the use of a TIAA-CREF insignia on TIAA documents, among other things. (Def. Reply 1; Turiano Decl. ¶ 7). But even crediting these assertions, the Court finds insufficient evidence to make the "full showing" necessary to establish that TIAA dominated TC Services to the extent that this court should compel TIAA into FINRA arbitration under an alter ego theory. *Thomson-CSF*, 64 F.3d at 780.

And finally, while the Defendant has attempted to draw parallels to *Gilman Ciocia*, ultimately the evidence here is not sufficient to justify piercing the corporate veil. Even the court in *Gilman Ciocia* did not rest its decision on alter ego reasoning, emphasizing instead a record of obvious circumvention of FINRA rules. *See Gilman Ciocia Inc.*, 2017 WL 11530334, at *3 ("Plaintiff

24

cannot have it both ways — plaintiff cannot assert that defendant's employment is solely with [one entity] (and thus not subject to mandatory arbitration) and then assert damages on behalf of … a non-signatory to the employment agreement and non-party to this litigation, … subject to SEC regulations and mandatory arbitration under FINRA.").  Here, in sharp contrast to *Gilman Ciocia*, Plaintiff asserts its own damages.  (Compl. ¶ 25).

> **v.     Plaintiff Is Not Subject to TC Services' Arbitration Obligations Under a Theory of "Direct Benefits" Estoppel**

The theme of Defendant's imputation arguments is that "[Plaintiff] should not be permitted to intentionally structure its agreement to escape its subsidiary's obligation to litigate disputes with its associated persons (here, [Defendant]) before FINRA."  (Def. Br. 7).  In the final variation on this theme, Defendant emphasizes that "[Plaintiff] has availed itself of FINRA arbitration in the past," and argues from this that because Plaintiff "has clearly *previously benefited* from the FINRA arbitration venue against its registered representatives … it should not be allowed to escape its obligation to do so here."  (*Id.* at 10 (emphasis added)).  These allegations sound in estoppel, and like Defendant's other attempts to bind Plaintiff to TC Service's FINRA obligations, they fail on closer inspection.

A non-signatory may be estopped from avoiding arbitration where they "knowingly accepted the benefits of an agreement with an arbitration clause." *MAG Portfolio Consultant,* 268 F.3d at 61 (internal quotation marks omitted).  However, the benefits to the non-signatory must flow directly from the

agreement in order to estop the non-signatory.  *Thomson-CSF*, 64 F.3d at 779.
Again, this Court finds guidance in *Oppenheimer*, where the court found that
the "benefits that DBAG realized from DBSI's FINRA membership" were *indirect*
as opposed to direct.  *Oppenheimer*, 2010 WL 743915, at *3 (contrasting facts
with *Deloitte Noraudit A/S* v. *Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1061
(2d Cir. 1993)).  Similarly, the record before the Court here shows that Plaintiff
only indirectly benefitted from TC Services' FINRA membership as a parent,
and there is no evidence that the terms of TC Services' FINRA membership
expressly sought to bind Plaintiff.

Defendant cites *BGC Notes, LLC* v. *Gordon,* in which Gordon, a former
employee of FINRA-member BGC Financial, successfully moved to compel BGC
Financial's non-FINRA-member subsidiary BGC Notes to arbitrate its claims
against him because of the "direct benefits" it received from BGC Financial's
employment agreement with Gordon.  36 N.Y.S.3d 130, 132 (2016).  However,
the direct benefits in that case — payments on a loan issued by BGC Notes —
were explicit and "directly traceable to the employment agreement."  *Id.*  That
is, non-member BGC Notes was used precisely to avoid BGC Financial's
obligation to arbitrate in a FINRA forum, and as discussed above, benefitted
from BGC Financial's employment agreement explicitly naming BGC Notes as
the entity that would provide the loan.  There were no such direct benefits
conferred explicitly or otherwise in the employment agreements between
Plaintiff and Defendant here.  As a result, this Court will not compel Plaintiff to
arbitrate under an estoppel theory.

26

Given Defendant's failure to demonstrate that Plaintiff is a FINRA member or that it is subject to FINRA rules through its relationship with its subsidiary, FINRA's arbitration provision does not apply.  The Court thus proceeds to consider Defendant's arguments under the CNA and VSP with this conclusion in mind.

### 3.    Defendant's Employment Contracts Do Not Mandate Arbitration

### a.    The CNA Does Not Mandate Arbitration

In Defendant's view, the CNA mandates arbitration of this action because it "acknowledge[s] a requirement to arbitrate 'the ultimate merits of any claim for Employee's breach, including any requirement imposed by FINRA's Code of Arbitration Procedure.'"  (Def. Br. 2 (quoting CNA ¶ 7)).  In relevant part, the CNA states:

> Notwithstanding any requirement to arbitrate the ultimate merits of any claim for Employee's breach, *including any requirement imposed by FINRA's Code of Arbitration Procedure*, the Company shall be entitled to obtain temporary, emergency, or preliminary injunctive relief in a court of competent jurisdiction, which injunction shall remain in effect until a final award is made in any required arbitration proceeding … Nothing in this Paragraph shall be construed to prohibit the Company from seeking any other equitable or legal remedies for such breach or threatened breach, including the recovery of money damages from Employee.

(CNA ¶ 7 (emphasis added)).  The text of the CNA does not itself mandate arbitration, but rather merely acknowledges the enforceability of any independent arbitration agreement between Defendant and his employer. Significantly, however, the Court has just concluded that Plaintiff is not bound

by FINRA's arbitration provision, and Defendant has identified no similar

arbitration provision that could bind Plaintiff on these facts.[6]  And instead of

identifying any such independent agreement to arbitrate, the CNA uses

nonspecific language that evinces, at most, an abstract intent to not preclude

arbitration.  (*See id.* ("Notwithstanding any agreement to arbitrate….")).

### b.   The VSP Does Not Mandate Arbitration

Finally, Defendant argues that the VSP mandates arbitration.  (Def.

Br. 9-10).  Paragraph 19 of the VSP, titled "Resolution of Disputes," states that

the Defendant "agree[s] to submit to the jurisdiction of the courts of the State

of New York or the federal court located in the Southern District of New York in

connection with *any* action *related to* this Agreement[.]"  (VSP ¶ 19 (emphases

added)).  Defendant concedes "the lack of arbitration agreement" in the VSP.

(Def. Br. 8).  Undeterred, however, Defendant construes the language of

Paragraph 19 to mean that the VSP "is complementary to the prior agreements

to arbitrate, both via the arbitration agreement in the CNA and FINRA Rules,"

and, further, that the VSP "specifically incorporates" Defendant's agreement

---

[6]     For completeness, the Court finds that paragraph 7 of the CNA does not, on its own,
require arbitration of the instant claims.  For starters, in stating that Plaintiff may seek
"other" equitable or legal remedies, the CNA necessarily contemplates actions other
than arbitrations.  This is far from the clear agreement to arbitrate that the law
requires.  *See In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93
N.Y.2d 584, 589 (1999).  And it does not, for example, employ all-inclusive or
mandatory language of the kind courts have found to mandate arbitration.  *See, e.g.*,
*Applied Energetics, Inc.* v. *NewOak Cap. Mkts., LLC*, 645 F.3d 522, 525 (2d Cir. 2011)
("[A]ny dispute … shall be resolved through binding arbitration.");  *WorldCrisa Corp.* v.
*Armstrong*, 129 F.3d 71, 73 (1997) ("[A]ny dispute between the Parties over the terms of
this Agreement, or any claim of breach by either of the Parties would be submitted to
arbitration[.]");  *Collins & Aikman Prods. Co.* v. *Bldg. Sys., Inc.*, 58 F.3d 16, 18 (1995)
("Any claim or controversy arising out of or relating to this agreement shall be settled by
arbitration in the City of New York[.]").

with TC Services and thus the "accompanying obligation to arbitrate[.]" (Def.
Br. 9-10). Unsurprisingly, Plaintiff understands the VSP differently. In
Plaintiff's view, "[t]here can be no question that Paragraph 19 of the VSP
Agreement 'specifically precludes' arbitration." (Pl. Opp. 7). Neither view is
entirely right.

Stepping back for a moment, the Court observes that the instant action
is indisputably "related to" the VSP. (VSP ¶ 19). After all, the Complaint
alleges that Defendant breached the VSP's non-compete provision and seeks
damages for that breach. (Compl. ¶ 25 at 4-5 (Prayer for Relief); *see also* VSP
¶ 8(b)(ii)(C) (providing that Defendant cannot solicit business from former
clients for twenty-four months following the termination of his employment)).
But nothing in the VSP comes close to directly mandating arbitration.
Arbitration is mentioned exactly once in the VSP, in Defendant's agreement to
"cooperate in good faith with any investigation undertaken by TIAA in
connection with any action, *arbitration*, proceeding, or dispute involving
TIAA[.]" (VSP ¶ 13 (emphasis added)). At most, this text can be understood to
accept the enforceability of independent arbitration agreements, just as the
CNA does. It is neither a clear agreement to arbitrate nor a clear preclusion of
arbitration.

To his credit, Defendant does not blind himself to this text, and in fact
acknowledges that the VSP's specification of venue contemplates the possibility
of court actions. (*See* Def. Br. 7 (acknowledging that the VSP contains venue
and jurisdiction clauses)). But Defendant then proceeds to argue that the

Court should disregard this contractual language as an impermissible attempt by Plaintiff to "intentionally structure its agreement to escape its subsidiary's obligation to litigate disputes with [Defendant] before FINRA." (*Id.*). In support of this argument, Defendant references FINRA's Notice 16-25, which states that FINRA rules, including its arbitration requirement, cannot be contracted around by parties but rather are approved by the SEC and are binding on FINRA members and associated persons with the force of federal law. (Def. Br. 7; *see also* Turiano Decl., Ex. C).

Defendant's argument is foreclosed by precedent. The Second Circuit has found that FINRA's rules do not carry the full force of federal law and has further explained that self-regulatory organizations' arbitration provisions are default rules that can be overridden by more specific contractual terms. *See Credit Suisse Sec. (USA) LLC* v. *Tracy*, 812 F.3d 249, 254-56 (2d Cir. 2016); *see also Ameriprise Fin. Servs. Inc.* v. *Beland (In re Am. Express Fin. Advisors Secs Litig.)*, 672 F.3d 113, 132 (2d Cir. 2011). And, perhaps more significantly, the Court's earlier determinations that (i) the relevant parties to this dispute do not include TC Services and (ii) Plaintiff is not bound by any arbitration provision — either contractual or by dint of TC Services' FINRA membership — foreclose Defendant's construction of the VSP.

**CONCLUSION**

The above analysis makes plain that the parties to this action did not agree to arbitrate the instant claims.  Accordingly, Defendant's motion to compel arbitration is DENIED.  The Clerk of the Court is directed to terminate the motion at docket entry 27.

The parties are hereby ORDERED to confer and submit a proposed case management plan on or before **March 31, 2023**.

SO ORDERED.

Dated:      March 17, 2023
            New York, New York

                                        _____
                                        KATHERINE POLK FAILLA
                                        United States District Judge